UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DEWITT McGRIFF,

                    Plaintiff,

      -against-

SUPERINTENDENT KEYSER; HEARING
OFFICER POLIZZI; DIRECTOR OF SHU
VENNETOZZI, in their official and individual
capacities, and INVESTIGATOR STEPHEN
KEYSER,

                 Defendants.

17-cv-7307 (NSR)

OPINION & ORDER

---

NELSON S. ROMÁN, United States District Judge

      Plaintiff Dewitt McGriff ("Plaintiff" or "McGriff"), proceeding *pro se*, commenced the

instant action on September 22, 2017. (*See* Complaint, ECF No. 2; Amended Complaint ("AC"),

ECF No. 32.) In this action, Plaintiff alleges claims pursuant to 42 U.S.C. § 1983 sounding in the

First, Eighth, and Fourteenth Amendments to the United States Constitution against Defendants

Superintendent Keyser, Hearing Officer Polizzi, Director of SHU Venettozzi, and Investigator

Stephen Keyser (together, "Defendants"). Specifically, Plaintiff alleges that Defendants denied

him due process in relation to an administrative hearing, violated his First Amendment right to

petition the courts, violated his Fourteenth Amendment right to equal protection, and subjected

him to cruel and unusual punishment in violation of his Eighth Amendment rights.

      Pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), Defendants have moved

to dismiss the Amended Complaint. (*See* ECF No. 54.) For the following reasons, Defendants'

motion to dismiss is GRANTED in part and DENIED in part.


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/13/2019

1

**BACKGROUND**

**I.   Factual Allegations**

The following facts are derived from the Amended Complaint and are taken as true and constructed in the light most favorable to *pro se* Plaintiff for the purposes of this motion.

### a.   Misbehavior Report

Plaintiff is an inmate at the Sullivan Correctional Facility.  (AC ¶ 3.)  On October 17, 2015, Defendant Inv. Keyser ("Inv. Keyser") wrote a misbehavior report that alleged that three individuals—Plaintiff, another inmate named Aramas ("Inmate Aramas"), and Inmate Aramas's wife—conspired to bring drugs into the facility.  (*Id.* ¶ 8.)  As a result, at approximately 10:05 a.m. that same day, Plaintiff was placed in a Special Housing cell ("SHU").  (*Id.* ¶ 9.)

While Plaintiff was in the SHU, Inv. Keyser visited him to question him about whether he brought drugs into the prison and stated that they "had plaintiff on a phone making moves to get drugs in the prison" and "we got the drugs and the girl and we know you are behind it."  (*Id.* ¶ 10.)  Though Plaintiff denied any knowledge of or participation in the drug smuggling, Plaintiff nevertheless was charged two days later with "soliciting to smuggle contraband, abuse of telephone privileges, visiting procedure violations and conspiring."  (*Id.* ¶¶ 11–12.)

### b.   Administrative Hearing and Sentence

Subsequently, Plaintiff participated in a Tier III hearing before Hearing Officer Polizzi ("HO Polizzi").  (*Id.* ¶¶ 5, 13.)  At the hearing, Inv. Keyser failed to produce the two pieces of evidence that he had relied upon in Plaintiff's misbehavior report.  (*Id.* ¶ 4.)  First, while Inv. Keyser testified that Plaintiff used "coded language" on the phone call to attempt to purchase and smuggle drugs, Inv. Keyser did not identify such language while a recording of the call was played at the hearing.  (*Id.* ¶¶ 15–16.)  Plaintiff instead testified that the voices heard on the recording

were not his. (*Id.* ¶ 17.) This testimony went undisputed by both Inv. Keyser and HO Polizzi. (*Id.*)

Second, Inv. Keyser stated that a woman arrested in the same matter, Inmate Aramas's wife, had implicated the Plaintiff, however, Inv. Keyser did not supply any signed statements from her, nor did he read the statements she allegedly made into the record. (*Id.* ¶ 18.) Instead, the investigator who had arrested Inmate Aramas's wife testified that Inmate Aramas's wife stated that she did not know Plaintiff and that she had not made any incriminating statements against him. (*Id.* ¶ 19.) Additionally, Plaintiff's assistant at the hearing interviewed both Inmate Aramas and his wife and confirmed that they denied Plaintiff's involvement in the alleged event. (*Id.* ¶ 20.)

During the hearings, both Inv. Keyser and HO Polizzi initially indicated that there was no confidential informant ("CI") involved in the matter. (*Id.* ¶¶ 21–22.) This changed on or about the thirty-fifth day of Plaintiff's Tier III hearing, when HO Polizzi announced that there was a CI. (*Id.* ¶ 24.) At no point did HO Polizzi indicate that he or Inv. Keyser had interviewed the CI to determine the reliability of the testimony. (*Id.* ¶¶ 25–26.) HO Polizzi stated that: (1) Inv. Keyser made him aware of the CI at the start of the hearing; (2) Defendant Keyser had testified during a separate, confidential interview; (3) Plaintiff would not be allowed to know the contents of the "in camera" testimony; and (4) Plaintiff would not be allowed to know the testimony of the CI or submit questions to the CI. (*Id.* ¶ 24.) The record does not include any other evidence of a CI: The witness interview notice did not mention the CI's alleged testimony and did not list the CI as a witness who was requested by Plaintiff and denied by HO Polizzi. (*Id.* ¶ 27.) [1]

_____

[1] Defendants suggest that Plaintiff has "confuse[d] the taking of 'confidential testimony' from the Investigator [that] was taken at the hearing with the proposition that a confidential informant testified." (Defs. Mem. at 7.) Nevertheless, the Court must take Plaintiff's allegation that HO Polizzi "announced that in fact there was a CI" as true. (*See* AC ¶ 24.)

Plaintiff was found guilty of the misbehavior charges and sentenced to forty-five days of keeplock confinement and loss of privileges. (*Id.* ¶ 33.)

### c. Plaintiff's SHU Placement

While the Tier III proceedings were ongoing, Plaintiff spent thirty-eight days in the SHU. (*Id.* ¶ 41.) While in the SHU, Plaintiff was visited by Defendant Superintendent Keyser ("Sup. Keyser") and informed him about his concerns regarding the investigation, conditions of the SHU, and his administrative hearing. (*Id.* ¶¶ 42–47.) Sup. Keyser stated he would look into the investigation and the conduct of hearing. (*Id.* ¶ 48.) Moreover, Plaintiff informed Sup. Keyser of poor conditions in the SHU, including food that was contaminated with hair and construction-related debris, as well as disturbances caused by loud construction noises, for which inmates were not provided any earplugs. (*Id.* ¶¶ 49–53.) As a result of the construction noises, Plaintiff could not pray, review or prepare for his hearing, study, or sleep. (*Id.* ¶ 53.) Lastly, Plaintiff informed Sup. Keyser that he was concerned about his ability to defend himself at the hearing because: (1) HO Polizzi was not adhering to proper procedure; (2) Plaintiff was unaware of any reliable evidence against him; and (3) Plaintiff could only receive law materials if an officer delivered them, and Plaintiff felt misled regarding the existence of a CI. (*Id.* ¶ 54.) Despite his promises to do so, Sup. Keyser did not follow up with Plaintiff regarding his complaints. (*Id.* ¶ 56–58.)

### d. Plaintiff's Administrative Appeal

Plaintiff filed an administrative appeal and received an affirmation of the disposition from Defendant Venettozzi, the Director of the Special Housing Unit ("SHU Dir. Venettozzi"), who was responsible for reviewing administrative appeals and correcting any violations. (*Id.* ¶¶ 34–35.) There is no record of SHU Dir. Venettozzi requesting any documents other than those submitted by Plaintiff, and there is no indication that SHU Dir. Venettozzi meaningfully reviewed

Plaintiff's appeal.  (*Id.* ¶¶ 36–39.)  Instead, SHU Dir. Venettozzi merely "rubber stamped" the denial of the appeal.  (*Id.* ¶ 39.)

In total, Plaintiff served approximately eighty-three days confined in the SHU and keeplock even though he was only sentenced to forty-five days.  (*Id.* ¶ 59.)  Plaintiff spent thirty-eight days in the SHU prior to the disposition of his misbehavior report appeal, which was not credited towards the keeplock punishment period of forty-five days.  (*Id.* ¶ 61.)  During his confinement, Plaintiff was prohibited from utilizing the law library, gathering evidence, and laying the foundation for appeal.  (*Id.* ¶ 67.)

Plaintiff's alleged co-conspirator, Inmate Aramas, also filed an Article 78 petition.  (*Id.*)  Instead of litigating the petition, as they had in Plaintiff's case, Defendants conceded the petition and Inmate Aramas's misbehavior report was expunged and his privileges restored.  (*Id.* ¶¶ 68–69.)  HO Polizzi and Inv. Keyser informed Inmate Aramas of the CI on the third day of his hearing.  (*Id.* ¶¶ 71.)

## II.    Procedural History

Prior to the commencement of this suit, Plaintiff filed petition in state court pursuant to N.Y. C.P.L.R. Article 78 to review SHU Dir. Venettozzi's determination that Plaintiff was guilty of the misbehavior charges.  On January 26, 2017, the New York State Appellate Division, Third Department ruled in Plaintiff's favor.  The Appellate Division annulled the determination that Plaintiff was guilty of smuggling and conspiring to introduce drugs into the correctional facility

and ordered SHU Dir. Venettozzi to expunge all references to those charges from Plaintiff's institutional record. *See McGriff v. Venettozzi*, 146 A.D.3d 1269 (3rd Dep't 2017).

Specifically, the Appellate Division found that the determination regarding smuggling and conspiring to introduce drugs into the facility was "not supported by substantial evidence," because:

> The tape-recorded conversation that was read into the record during the hearing is replete with inaudible portions rendering it impossible to ascertain if . . . petitioner was a participant in the smuggling plan. . . .
>
> [T]he investigator who authored the misbehavior report did not identify the coded language allegedly used during the telephone conversation that led him to believe that petitioner was involved in such a plan. . . .
>
> The confidential information considered by the Hearing Officer in camera—which only calls the accuracy of the conversation read into the record at the hearing into further doubt—does not remedy these deficiencies. Thus, the determination must be partially annulled.

*McGriff*, 146 A.D.3d at 1269–70.

## LEGAL STANDARD

### I.       12(b)(6)

To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). Factual allegations must "nudge [a plaintiff's] claim from conceivable to plausible." *Twombly*, 550 U.S. at 570. A claim is plausible when the plaintiff pleads facts which allow the court to draw a reasonable inference the defendant is liable. *Iqbal*, 556 U.S. at 678. To assess the sufficiency of a complaint, the court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013). While legal conclusions may provide the "framework of a complaint," "threadbare recitals of the elements of

a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678–79.

*Pro se* complaints are to be liberally construed. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). They must be held to less stringent standards than complaints written by lawyers, and only dismissed when the plaintiff can prove "no set of facts in support of his claim which would entitle him to relief." *Estelle*, 429 U.S at 106 (quoting *Conley v. Gibson*, 335 U.S. 41, 45–46 (1957)). This "is particularly so when the *pro se* plaintiff alleges that [his] civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). *Pro se* complaints must be interpreted as raising the strongest claims they suggest, but "must still state a plausible claim for relief." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013).

## II.    42 U.S.C. § 1983 Claims

Section 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). To state a claim under § 1983, a plaintiff must allege two essential elements: "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.'" *Giordano v. City of New York*, 274

F.3d 740, 750 (2d Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)).

**DISCUSSION**

**I.  Due Process**

Plaintiff contends that he was not afforded proper process before he was placed in SHU and keeplock confinement in violation of his Fourteenth Amendment due process rights. Defendants maintain that Plaintiff has failed to adequately state a claim for due process violations. For the following reasons, this Court finds that Plaintiff has sufficiently pleaded some, but not all, of his due process claims.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. To state a procedural due process claim, Plaintiff must show "(1) that Defendants deprived him of a cognizable interest in life, liberty, or property, (2) without affording him constitutionally sufficient process." *Proctor v. LeClaire,* 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

**a.  Liberty Interest**

Regarding the first prong, a prisoner's liberty interest may be implicated by SHU or keeplock confinement "only if the discipline imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir. 2009) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). To determine whether the plaintiff endured an "atypical and significant hardship," courts consider "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions" as well as the duration of the segregated confinement. *Davis,* 576 F.3d at 133. Although the Second Circuit

has declined to establish bright-line rules in this area, it has explicitly noted that "SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions" or "a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards*, 364 F.3d 60, 65 (2d Cir. 2004).

Here, the confinement periods were relatively short: 38 days of SHU confinement during the disciplinary hearing process, and 45 days of keeplock confinement that was subsequently imposed as Plaintiff's sentence. Aside from the duration of confinement, Plaintiff alleges several "harmful conditions encountered in SHU": "unhygienic," "dirty" food served with hair and construction-related debris, as well as "horrendous concussive 'booming' sounds" resulting from construction work. (AC ¶¶ 49–53.) While the corrections "officers, construction workers, and civilians in the area were offered earplugs," the inmates were not. (*Id.* ¶ 52.) As a result of the loud disturbances, Plaintiff could not pray, review or prepare for his hearing, study, or sleep. (*Id.* ¶ 53.) Apart from the allegations regarding conditions in the SHU, the Amended Complaint is bereft of any facts describing the conditions of the keeplock confinement. Plaintiff references the "loss of [his] privileges" (AC ¶ 33) and asserts the "deprivation of liberty and amenity, and physical torture and emotional injury due to the time . . . confined in . . . keep-lock" (AC at 14), but nothing more.

The Second Circuit, "[i]n the absence of a detailed factual record, [has] affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than [ ] 30 days . . . and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer*, 364 F.3d at 65–66. The two periods of confinement in the instant case exceed 30 days each. Furthermore, *pro se* Plaintiff's complaints regarding food contamination

and "concussive" noises could plausibly be construed as an atypical and significant hardship. At the motion to dismiss stage, and absent further development of the factual record, this is sufficient to allege an implicated liberty interest with respect to the SHU confinement. *See, e.g., Sealey v. Giltner*, 116 F.3d 47, 52 (2d Cir.1997) ("[W]e have indicated the desirability of fact-finding before determining whether a prisoner has a liberty interest in remaining free from segregated confinement.") (citing cases). It does not appear "beyond doubt that the plaintiff can prove no set of facts in support of his claim" regarding SHU confinement. *Estelle*, 429 U.S at 106 (quoting *Conley*, 335 U.S. at 45–46).[2]

Even applying these liberal standards, however, the court finds Plaintiff has failed to establish a liberty interest implicated by his keeplock confinement. Plaintiff has not alleged any facts that could, even generously construed, rise to an atypical and significant deprivation. The "loss" of unspecified "privileges" and "deprivation of liberty and amenity, and physical torture and emotional injury" amount to mere conclusory statements. *See Colon v. Annucci*, 344 F. Supp. 3d 612, 634 (S.D.N.Y. 2018) (dismissing due process claim where "Plaintiff also does not allege any facts suggesting that he was exposed to any conditions of confinement more harsh than typical keeplock; indeed, he cites only the loss of unspecified privileges.").

Accordingly, Plaintiff's due process claim is dismissed without prejudice as to the keeplock confinement. In light of Plaintiff's *pro se* status, Plaintiff is granted leave to amend his Amended Complaint to allege facts regarding the conditions of his keeplock confinement. Because Plaintiff has properly pleaded a liberty interest with respect to the SHU confinement, the Court next considers whether Plaintiff was afforded constitutionally sufficient process.

---

[2] Defendants cite several cases in which confinements of a similar, relatively brief duration were found not to implicate a liberty interest—but these cases were decided at the summary judgment stage, rather than on motions to dismiss. (*See* Defs. Mem. at 5–6; Defs. Reply Mem. at 2.)

### b. Constitutionally Sufficient Process

"Once an inmate demonstrates a liberty interest in avoiding segregated confinement, he or she must also show that assignment to such confinement occurred without due process of law." *Hamilton v. Deputy Waren,* No. 15-CV-4031 (KBF), 2016 WL 6068196, at *7 (S.D.N.Y. Oct. 13, 2016). What process is due, however, depends on the type and purpose of segregation— the procedural protections that must be afforded when the confinement is for "disciplinary" reasons are distinct from those required when the confinement serves "administrative" purposes. *Id.; see also Wheeler-Whichard v. Roach,* 468 Fed. App'x 28, 30 (2d Cir. 2012) (summ. order) (outlining the distinct procedural due process standards for disciplinary versus administrative segregation). Plaintiff's confinement in the SHU, during which his Tier III hearing was conducted, was administrative in nature. *See, e.g., Proctor*, 846 F.3d at 609 ("Ad[ministrative] Seg[regation] is appropriate when necessary to . . . 'complet[e] . . . an investigation into misconduct charges.'") (quoting *Hewitt v. Helms,* 459 U.S. 474, 476 (1983)); *El-Shabazz v. Wangenstein*, No. 92 CIV. 7291 (LBS), 1995 WL 489686, at *5 (S.D.N.Y. Aug. 15, 1995) (placing plaintiff in administrative segregation pending a hearing on misconduct charges was "a reasonable response to concerns for institutional order and security"); *see also* 7 N.Y.C.R.R. § 270.3 (describing tiers of disciplinary hearings); 7 N.Y.C.R.R. § 301.4 (describing administrative segregation prior to Tier III hearing "result[ing] from a determination by the facility that the inmates' presence in general population would pose a threat to the safety and security of the facility").[3]

---

[3] Plaintiff argues that the misconduct investigation was completed before he was placed in the SHU, which therefore renders his placement punitive in nature. (*See* AC ¶¶ 64, 67). However, there is no indication that Defendants intended to punish Plaintiff, rather, it was reasonable for Defendants to isolate Plaintiff after he was implicated in a conspiracy to smuggle drugs into the correctional facility. *See, e.g.*, *Taylor v. Comm'r of New York City Dep't of Corr.*, 317 F. App'x 80, 82 (2d Cir. 2009) (where there was no evidence demonstrating the defendants intended to punish plaintiff, administrative segregation found "not excessive in relation to the purpose of maintaining safety").

"Administrative Segregation is not punitive, and thus is governed by less restrictive procedural protections than those required under *Wolff*." *Colon v. Annucci*, 344 F. Supp. 3d 612, 636–37 (S.D.N.Y. 2018). Assignment to administrative segregation requires only "some notice of the charges against [the inmate] and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir. 2001) (internal quotation marks omitted) (quoting *Hewitt*, 459 U.S. at 476). Once the inmate has had the opportunity to present his views, "prison officials need only conduct 'an informal, nonadversary evidentiary review' of whether the confinement is justified." *Proctor*, 846 F.3d at 609 (quoting *Hewitt*, 459 U.S. at 476). "Their final Ad[ministrative] Seg[regation] decision may 'turn[ ] largely on purely subjective evaluations and on predictions of future behavior.'" *Id.* (quoting *Hewitt*, 459 U.S. at 474). Nevertheless, the Second Circuit has found that federal law requires "some evidence" to support an administrative custody designation that is "reliable." *Taylor*, 238 F.3d at 194; *see also Pusepa v. Annucci*, No. 17-CV-1765 (RA), 2019 WL 690678, at *10 (S.D.N.Y. Feb. 19, 2019) (requiring "some reliable evidence" to support administrative segregation and observing "[i]n the context of assessing confidential informant testimony, *Taylor* held that an 'independent credibility assessment' is required to ensure the evidence is reliable.").

The Amended Complaint states that "On October 17, 2015, defendant Inv. Keyser wrote a misbehavior report alleging that McGriff, Inmate Aramas and inmate Aramas' wife, had

---

Additionally, Plaintiff contends that "Once a report is filed, and an inmate is confined due to that report, the confinement time must count toward any disposition of guilt and the sanctions that may be imposed." (AC ¶ 65). The Court has not found any support for that proposition. "New York law does not require pre-hearing administrative time served to be credited to a disciplinary sentence." *Nowlin v Selsky*, 91 CIV. 2716 (JFK), 1992 WL 196782, at *3 (SDNY Aug. 5, 1992); *see also Mastropietro v. New York State Dep't of Corr.*, 52 A.D.3d 1125, 1126, 862 N.Y.S.2d 131, 132 (3d Dep't 2008) ("[T]here is no authority for petitioner's assertion that he should have received credit toward his administrative penalty for time spent in confinement before the hearing.") (citations omitted); 7 N.Y.C.R.R. § 251-5.1(a) (addressing timeliness of hearing following an inmate's initial confinement).

conspired to introduce drugs into the Sullivan Correctional Facility," and that "McGriff was removed from general population and placed in a Special Housing cell (SHU) at approximately 10:05am." (*See* AC ¶¶ 9–10). Plaintiff acknowledges that, two days after being placed in the SHU, he received a written copy of the misbehavior report that outlined the charged against him. (*See id.* ¶ 12). Plaintiff also describes being given the opportunity to present his views to Inv. Keyser, who authored the misbehavior report. (*See id.* ¶¶ 10–11). Thus, it appears Plaintiff received notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation in satisfaction of the first of *Taylor*'s minimum requirements.

The events that transpired during the Tier III hearing that followed, however, call into question whether Inv. Keyser's preliminary evidentiary review was based on "some evidence" that was "reliable." Plaintiff asserts that "[n]one of the evidence claimed to exist by Inv. Keyser was ever produced at the hearing": "the voices heard on the phone recording were not McGriff's, no witness or co-conspirator pointed to his involvement," and "at no time did the HO [Polizzi] state that Inv. Keyser had determined the reliability of the [confidential informant.]" (AC ¶¶ 23, 26, 28–29). For this reason, the Court declines to dismiss Plaintiff's due process claim at this early stage.[4]

---

[4] Plaintiff raises collateral estoppel and res judicata claims based on the New York State Appellate Division, Third Department's Article 78 ruling issued in 2017. *See McGriff v. Venettozzi*, 146 A.D.3d 1269 (3rd Dep't 2017). As discussed *supra*, the Appellate Division found that the determination regarding smuggling and conspiring to introduce drugs into the facility was "not supported by substantial evidence." *McGriff*, 146 A.D.3d at 1269–70.

Collateral estoppel, or issue preclusion, bars the re-litigation of issues that were "clearly raised in a prior action or proceeding and decided against that party . . ., whether or not the tribunals or causes of action are the same." *Town of Ramopo, New York v. Town of Clarkstown*, No. 16 Civ. 2004 (NSR), 2017 WL 782500, at * 6 (S.D.N.Y. Feb. 27, 2017) (quoting *Leather v. Eyck*, 180 F.3d 420, 425 (2d Cir. 1999)). Collateral Estoppel under New York law is applicable upon a showing of two factors: "First, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded from relitigating the issue must

### c. Claims Against Particular Defendants

Defendants nonetheless contend that even if Plaintiff has stated viable constitutional claims, those claims must be dismissed on the grounds of lack of personal involvement and/or the defense of qualified immunity.

*Personal Involvement Requirement*

"[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Grullon v. City of New Haven*, 720 F.3d 133, 138–39 (2d Cir. 2013). Instead, "a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity." *Warren v. Pataki*, 823

---

have had a full and fair opportunity to contest the prior determination." *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455 (N.Y. 1985).

In the instant case, Defendants are correct that the litigation regarding the Article 78 proceeding determined only the narrow issue of whether there was "substantial evidence" to support his disciplinary sentence, and did not decide whether Plaintiff's rights under federal law were violated. *McGriff*, 146 A.D.3d at 1269–70. Consequently, this Court is not prepared to find that the identical issue was necessarily decided by the New York Appellate Division. *See Kaufman*, 65 N.Y.2d at 455; *Colon v. Coughlin*, 58 F.3d 865, 871 (2d Cir. 1995) (applying the requirements of issue preclusion strictly).

Plaintiff's invocation of res judicata principles fails as well. Under the full faith and credit doctrine, federal courts must accord final judgments of state courts the same preclusive effect that such judgments would have in the state courts. *See* 28 U.S.C. § 1738. Under New York law, "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories." *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357 (N.Y. 1981). Successive litigation based on the same or connected transactions is barred "if (i) there is a judgment on the merits rendered by a court of competent jurisdiction, and (ii) the party against whom the doctrine is invoked was a party to the previous action." *Matter of People v. Allied Card Sys., Inc.*, 11 N.Y.3d 105, 122 (N.Y. 2008). Even in a § 1983 case, preclusive effect is given to state-court judgments as to both issues that were "actually litigated" and issues that "could have been raised but were not actually raised." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81–83 (1984).

The present suit and Plaintiff's Article 78 proceeding obviously concern the same transactions. Defendants HO Polizzi, Inv. Keyser and Sup. Keyser, however, were not party to the Article 78 proceeding—and Defendant Venettozzi was only named in his official capacity (whereas in the instant case, he is also named in his individual capacity). Therefore, the current claims cannot be barred by res judicata. *See Graham v. Select Portfolio Servicing, Inc.*, 156 F. Supp. 3d 491, 509 (S.D.N.Y. 2016) (party asserting res judicata must show, *inter alia*, that "the previous action involved the parties or those in privity with them.") (quoting *Pike v. Freeman*, 266 F. 3d 78, 91 (2d Cir. 2001)).

F.3d 125, 136 (2d Cir.) (emphasis added) (internal quotation marks omitted), *cert. denied sub nom. Brooks v. Pataki*, 137 S. Ct. 380 (2016).   As the Second Circuit has explained, the personal involvement of a supervisory defendant may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Courts in this Circuit, however, are "divided as to whether the five categories announced in *Colon* may still be used as the bases for liability under § 1983" following the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  *Allah v. Annucci*, No. 16-CV-1841 (KMK), 2017 WL 3972517 at *6 (S.D.N.Y. Sept. 07, 2017).  The Second Circuit has not squarely addressed how *Iqbal*, which "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," affects the standards in *Colon* for establishing liability.  *Allah*, 2017 WL 3972517 at *6 (internal quotation marks and citations omitted); *see also Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012) ("*Iqbal* has, of course, engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon v. Coughlin.*").  Overall, however, "[t]he majority of the district courts . . . have held that, absent any contrary directive for the Second Circuit, all five *Colon* factors survive where the constitutional violation at issue does not require a showing of discriminatory intent."  *Allah*, 2017 WL 3972517 at *6 (quoting *El-Hanafi v. United States*, No, 13-CV-2072, 2015 WL 72804,

at *13 (S.D.N.Y. Jan. 6, 2015)) (collecting cases). This Court has already expressed its agreement with that proposition, and will apply it with equal force here.[5]

Because Plaintiff's procedural due process claims do not require a showing of discriminatory intent, the Court will apply all five *Colon* factors. *See Marom v. City of New York*, No. 15-CV-201 (PKC), 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016), *partially reconsidered on separate grounds*, No. 15-CV-2017 (PKC), 2016 WL 5900217 (S.D.N.Y. July 29, 2016) (recognizing that, in areas outside of discrimination, *Iqbal* only requires that a supervisor's action—whether direct or through 'his or her superintendent responsibilities'—must itself violate the terms of the constitutional provision at issue.").

*Qualified Immunity*

The doctrine of qualified immunity gives officials 'breathing room to make reasonable but mistaken judgments about open legal questions.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). As such, "qualified immunity shields both state and federal officials from suit unless [1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (internal quotation marks omitted). To determine whether a right was clearly established, the Court looks to: (1) whether the right was defined with "reasonable specificity"; (2) whether the Supreme Court and the applicable circuit court support the existence of the right; and (3) whether under existing law a reasonable defendant would have understood that the conduct was unlawful. *See Gonzalez v. City of Schenectady*, 728 F.3d 149, 161 (2d Cir. 2013). "In this Circuit, a defendant may [raise qualified immunity in a pre-answer motion to

---

[5] *See Booker v. Griffin*, No. 16-CV-00072 (NSR), 2018 WL 1614346, at *11 (S.D.N.Y. Mar. 31, 2018); *Marshall v. Annuci*, No. 16-CV-8622 (NSR), 2018 WL 1449522, at *9 (S.D.N.Y. Mar. 22, 2018); *Matteo v. Perez*, No. 16-CV-1837 (NSR), 2017 WL 4217142, at *5 (S.D.N.Y. Sept. 19, 2017).

dismiss], but the defense is held to a higher standard than if it were asserted in a motion for summary judgment." *Sledge v. Bernstein*, No. 11 CV. 7450(PKC)(HBP), 2012 WL 4761582, at *4 (S.D.N.Y. Aug. 2, 2012); *see also McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (a defense of qualified immunity in a motion to dismiss can only be sustained if plaintiff cannot state any facts that would prevent the application of qualified immunity).

The Court considers the personal involvement and qualified immunity defenses of each Defendant in turn.

### i. SHU Director Venettozzi

Although SHU Dir. Venettozzi occupies a supervisory role as Director of the Special Housing Unit, he did not have any personal involvement in the Tier III hearing itself. Therefore, the Court must consider whether any of the other *Colon* factors are met, such that liability for SHU Dir. Venettozzi in his individual capacity may be established.

Here, Plaintiff sufficiently alleges the personal involvement of SHU Dir. Venettozzi under the second *Colon* factor (*i.e.*, "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong"). *Colon*, 58 F.3d at 873. Plaintiff alleges that he submitted an administrative appeal to SHU Dir. Venettozzi, and that Plaintiff asserted various "violations of statutory and constitutional rights" in that appeal (*Id.* ¶¶ 34, 39.) As the Director of Special Housing, SHU Dir. Venettozzi ostensibly had the ability to remedy the ongoing wrong Plaintiff complained of—his placement in administrative segregation and keeplock confinement without due process of law. Yet, Plaintiff contends that despite being made aware of the alleged due process violations, SHU Dir. Venettozzi affirmed his placement in segregation. Thus, SHU Dir.

Venettozzi's actions fall squarely within the second category of *Colon*, rendering him sufficiently involved in the alleged violations. *See* 58 F.3d at 873.[6]

Having found that the Complaint sufficiently alleges SHU Dir. Venettozzi's personal involvement in the deprivation of Plaintiff's constitutional rights, the Court must now consider whether SHU Dir. Venettozzi is nonetheless immune from liability. The Court finds that he is.

On this procedural due process issue, some uncertainty within this Circuit's case law serves in SHU Dir. Venettozzi's favor. Because "courts in this circuit disagree over whether the failure to remedy a wrong after being informed of a constitutional violation through a report or appeal remains sufficient to establish a supervisor's personal involvement in a constitutional violation," *Richardson v. Williams*, No. 15-CV-4117 (VB), 2016 WL 5818608, at *3 (S.D.N.Y. Oct. 5, 2016),[7] a reasonable official in SHU Dir. Venettozzi's position could have been unaware that denying Plaintiff's appeal would be unlawful. Thus, although SHU Dir. Venettozzi may have "had the authority to review the events at the hearing and dismiss in whole or in part, or order a new hearing, for wrongful acts" (AC ¶ 79), the legal implications of his personal involvement were not "clearly established." Accordingly, SHU Dir. Venettozzi is immune from suit in his individual capacity as to the due process claims, and such claims are dismissed. *See Richardson*, 2016 WL 5818608, at *3 (granting qualified immunity to a defendant who affirmed the result of a prison disciplinary proceeding because at the time of the appeal, it would not necessarily be clear to a reasonable government official that his conduct was unlawful in the situation confronted).

---

[6] Courts within this Circuit are split as to "whether an appeal officer may be held liable for failing to reverse the outcome of an allegedly unconstitutional disciplinary hearing." *Colon v. Annucci*, 344 F. Supp. 3d 612, 630 (S.D.N.Y. 2018) (citing *Lebron v. Mrzyglod*, No. 14-CV-10290 (KMK), 2017 WL 365493, at *9 (S.D.N.Y. Jan. 24, 2017)); *see also Ortiz v. Russo*, No. 13 CIV. 5317 ER, 2015 WL 1427247, at *13 (S.D.N.Y. Mar. 27, 2015) (collecting cases). This Court has already expressed agreement with cases holding that a defendant may be sufficiently involved where, after being informed of an ongoing constitutional violation through a report of appeal, he or she fails to remedy the wrong. *See Booker v. Griffin*, No. 16-CV-00072 (NSR), 2018 WL 1614346, at *11 (S.D.N.Y. Mar. 31, 2018).

[7] *See supra* note 6.

### ii.     Superintendent Keyser

With respect to Sup. Keyser, Plaintiff makes several attempts to tie him to the alleged procedural due process violations.  His individual involvement, however, is attenuated at best. Sup. Keyser did not participate in the Tier III hearing or the administrative appeal.  Unlike SHU Dir. Venettozzi, Sup. Keyser did not have the power to review or modify, if needed, the results of the Tier III hearing.  Thus, the first and second *Colon* factors are not applicable to him.  *See Colon*, 58 F.3d at 873.  Plaintiff alleges that Sup. Keyser "failed to instruct, supervise, control and discipline on a continuing basis HO Pol[i]zzi." (AC ¶77).  However, this does not satisfy any of the remaining *Colon* factors: Plaintiff has not alleged facts that would rise to the level of plausibly showing Sup. Keyser's support of any "policy or custom under which unconstitutional practices occurred," "gross[] negligen[ce] in supervising subordinates," or "deliberate indifference" with regard to the alleged due process violations.  *See Colon*, 58 F.3d at 873; *Black*, 76 F.3d at 74. Therefore, Plaintiff has failed to allege Sup. Keyser's personal involvement in the alleged due process violations, and the such claims are dismissed as to Sup. Keyser.  For this reason, the Court need not address Sup. Keyser's qualified immunity defense to Plaintiff's due process claims.

### iii.     Hearing Officer Polizzi and Inv. Keyser

HO Polizzi, by contrast, directly oversaw the Tier III hearing, and therefore his personal involvement is plainly established.  Similarly, Inv. Keyser authored the misconduct report and participated in the Tier III hearing, thus, his personal involvement is also clear.  As to their qualified immunity defense, the question presented is whether these two defendants violated Plaintiff's due process rights that were "clearly established."  *Terebesi*, 764 F.3d at 230.  "It is— and was at the time of the alleged conduct—well established that . . . denial of due process in Ad[ministrative] Seg[regation] proceedings . . . violates the Constitution." *Pusepa*, 2019 WL

690678, at *10 (citing *Hewitt*, 459 U.S. at 476) (rejecting qualified immunity defense to claim of denial of due process in administrative segregation proceedings). Accordingly, the Court will not find HO Polizzi and Inv. Keyser immune from suit at this early stage of litigation.[8]

## II. Eighth Amendment Cruel and Unusual Punishment

Next, Plaintiff alleges that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment. (*See,* AC ¶¶ 1, 49–53, 73, 76, 78.) His complaint, liberally construed, raises two qualms with his conditions of confinement: (1) food contaminated with hair and "dust/plaster-like coatings" from the construction work; and (2) the "booming" construction noises, for which inmates were not provided earplugs. (*Id.* ¶¶ 49–53.)

For a prisoner to prevail on a claim asserting that he was subjected to cruel and unusual punishment, he must prove both "an objective element—that the prison officials' transgression was 'sufficiently serious'—and a subjective element—that the officials acted, or failed to act, with a 'sufficiently culpable state of mind,' *i.e.*, with 'deliberate indifference to inmate health or safety.'" *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). To meet the objective element, Plaintiff must show that the conditions "pose[d] an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). To meet the subjective element, Plaintiff must "show that the defendant acted with 'more than mere negligence.'" *Id.* at 125 (quoting *Farmer*, 511 U.S. at 835).

Beginning with the objective element, the Court finds that Plaintiff's allegations regarding "dirty" food are not "sufficiently serious . . . to reach constitutional dimensions." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (internal quotation marks omitted). The Eighth

---

[8] The qualified immunity defense is "typically addressed at the summary judgment stage," because it "usually depends on the facts of the case, . . . making dismissal at the pleading stage inappropriate." *Woods v. Goord*, No. 01-CV-3255, 2002 WL 731691, at *10 (S.D.N.Y. Apr. 23, 2002) (citing *King v. Simpson*, 189 F.3d 284, 289 (2d Cir. 1999)).

Amendment does require that prisoners be served "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980)). Plaintiff's Amended Complaint, however, does not allege that the food he was served was nutritionally inadequate or posed any threat to his health. While certainly unpleasant, the food described does not give rise to a constitutional violation. *See, e.g., McFadden v. Solfaro*, No. 95 CIV. 1148 (LBS), 1998 WL 199923, at *13 (S.D.N.Y. Apr. 23, 1998) ("One or two instances of finding a hair in one's food is not only not a punitive and unconstitutional violation of rights but a frequent occurrence, even for non-incarcerated diners in better restaurants."); *Atkins v. Cty. of Orange*, 372 F. Supp. 2d 377, 405 (S.D.N.Y. 2005), *aff'd on other grounds sub nom. Bellotto v. Cty. of Orange*, 248 F. App'x 232 (2d Cir. 2007) (food served on a napkin or paper towel not deemed unconstitutionally unsanitary); *cf. Willey v. Kirkpatrick*, 801 F.3d 51, 69 (2d Cir. 2015) (finding *pro se* plaintiff adequately pleaded an Eighth Amendment claim by alleging that his restricted diet of stale bread and rotten cabbage was unusually unhealthy).

The "concussive" noises, on the other hand, for which earplugs were provided to others in the facility, could plausibly rise to the level of noise that "constitutes a threat to hearing and mental health." *See Rhem v. Malcolm*, 371 F. Supp. 594, 607–08, 628 (S.D.N.Y.), *supplemented*, 377 F. Supp. 995 (S.D.N.Y. 1974), *aff'd and remanded*, 507 F.2d 333 (2d Cir. 1974) (finding Eighth Amendment was violated where volume of noise was "intolerable"); *see also Marhone v. Cassel*, No. 16-CV-4733 (NSR), 2018 WL 4189518, at *9 (S.D.N.Y. Aug. 31, 2018), *appeal dismissed*, No. 18-2972, 2019 WL 5078231 (2d Cir. Apr. 2, 2019) (Eighth Amendment claim sufficiently pleaded where Plaintiff faced "constant clacking" sounds and "suffered from sleep deprivations"

as a result). Plaintiff alleges he could not pray, review or prepare for his hearing, study, or sleep as a result of the booming sounds. (AC ¶ 53.) At the point at which other officers in the area were provided ear protection, the exposure to loud noises could have reached a severity level harmful to Plaintiff's hearing and mental wellbeing. *See Arce v. Miles*, No. 85 CIV. 5810 (SWK), 1991 WL 123952, at *10 (S.D.N.Y. June 28, 1991) ("Deliberate exposure to excessive and injurious noise has long been a ground for claims of cruel and unusual punishment.") (collecting cases); *see also Walker*, 717 F.3d at 126 ("[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment.") (collecting cases). Therefore, on this first element, the Court finds that the alleged conditions were sufficiently serious under the objective prong to plead a constitutional deprivation.

Turning to the second element, "traditionally referred to . . . as the subjective prong," and better described as the "*mens rea* prong" or "mental element prong," *Darnell v. Pineiro*, 849 F.3d 17, 32 (2d Cir. 2017), Plaintiff has adequately alleged that Defendant acted with a sufficiently culpable state of mind. To establish liability in cases involving inhumane prison conditions, the Supreme Court requires that a prison official's "state of mind is one of 'deliberate indifference' to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998). An official acts with "deliberate indifference" when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. As the Court stated, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838. In other words, "a prisoner must demonstrate more than 'an inadvertent failure to

provide adequate medical care' by prison officials to successfully establish Eighth Amendment liability." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003).

Liberally construed, Plaintiff's Amended Complaint adequately alleged that Sup. Keyser knew of and disregarded the excessive risks to Plaintiff's health and safety. Plaintiff alleges that he "made Sup. Keyser aware of specific problems he was encountering concerning . . . the conditions he faced while confined in SHU." (AC ¶¶ 43, 49–53.) In response, Sup. Keyser instructed Plaintiff to write down his concerns regarding the conditions in SHU, and that Sup. Keyser would "personally look into the matters." (*Id.* ¶ 55.) As instructed, Plaintiff sent letters to Sup. Keyser as well as follow-up inquiries, yet, Plaintiff alleges that Sup. Keyser instead "ignor[ed] McGriff through correspondence and any subsequent rounds in SHU" and acted with "knowing, reckless, and deliberate disregard." (*Id.* ¶¶ 56–58, 78.) The Court assumes, at this stage in the litigation, that Sup. Keyser was on notice of possible risks to Plaintiff's health and wellbeing upon receiving the oral and written grievances from Plaintiff. Moreover, Plaintiff has specifically alleged that Sup. Keyser personally disregarded any such risks to Plaintiff by ignoring Plaintiff's written and in-person pleas for assistance. Therefore, Plaintiff has sufficiently pleaded the subjective element of this claim regarding Sup. Keyser. *See Walker*, 717 F.3d at 129–30; *Arce*, 1991 WL 123952, at *10 (allegation that prison authorities supplied ear plugs to guards and workers but not to inmates satisfies the "deliberate indifference" standard).

Because the Court has also found that the alleged conditions were sufficiently serious under the objective prong as to establish a constitutional deprivation, the Court declines to dismiss Plaintiff's Eighth Amendment claim as to Sup. Keyser. But, because Plaintiff does not allege that Defendants SHU Dir. Venettozzi, HO Polizzi, or Inv. Keyser were at all aware of the conditions that Plaintiff allegedly faced in the SHU, Plaintiff's Eighth Amendment claims are dismissed

without prejudice as to those defendants. *See Farmer*, 511 U.S. at 837 (requiring official to "know of . . . an excessive risk to inmate health or safety"); *Arce*, 1991 WL 123952, at *10 (dismissing Eighth Amendment claim regarding injurious construction noise against several defendants who were not aware of conditions). To the extent that Plaintiff can provide more factual allegations relating to SHU Dir. Venettozzi, HO Polizzi, or Inv. Keyser's culpable state of mind with respect to Plaintiff's alleged injuries caused by the loud noises, Plaintiff is granted leave to replead his claim.

Again, Defendants contend that Plaintiff's Eighth Amendment claim must be dismissed on the grounds of lack of personal involvement and/or qualified immunity. The Court finds that neither avenue offers Sup. Keyser a lifeline at this stage.

In considering Sup. Keyser's personal involvement regarding the Eighth Amendment claims, which do not contain allegations of discrimination, *Colon*'s five factors will apply for the reasons stated above. The fifth *Colon* factor, that "the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring," *Colon*, 58 F.3d at 873, mirrors the Eighth Amendment's subjective prong analysis. Given that the Court has already found that Plaintiff has adequately pleaded the subjective element of his Eighth Amendment claim, it finds that likewise, Plaintiff has adequately pleaded Sup. Keyser's personal involvement under the fifth *Colon* factor.

Sup. Keyser's defense of qualified immunity turns on whether Plaintiff's Eighth Amendment rights were "clearly established." As courts in this circuit have recognized, a "[p]laintiff's right to safe and sanitary conditions of confinement . . . [has been] 'clearly established.'" for purposes of qualified immunity analysis. *See Christian v. Warden of O.B.C.C.*, No. 17CIV2587GBDBCM, 2018 WL 1441401, at *3 (S.D.N.Y. Mar. 22, 2018); *Brandon v. Royce*,

No. 16 CV 5552 (VB), 2019 WL 1227804, at *10 (S.D.N.Y. Mar. 15, 2019) ("[P]laintiff's right to humane conditions of confinement, particularly those that do not prevent an inmate from adequate sleep, was clearly established.").  Furthermore, in circumstances where a plaintiff's complaint "plausibly alleged conditions of confinement that could constitute cruel and unusual punishment, and that defendants acted (or failed to act) with deliberate indifference," the Second Circuit has held that "further facts are required to decide the question of qualified immunity."  *See Walker*, 717 F.3d at 130.  In keeping with that approach, the Court declines to dismiss Plaintiff's Eighth Amendment claim at the pleadings stage on this basis.

III.    **First Amendment Access to Courts**

Plaintiff's also alleges that that Defendants violated his First Amendment rights.  The Amended Complaint, however, does not plausibly allege facts to support such a claim for the reasons set forth below.

Inmates have a "constitutional right of access to the courts" under the First Amendment. *Bourdon v. Loughren*, 386 F.3d 88, 92–93 (2d Cir. 2004) (quoting *Bounds v. Smith*, 430 U.S. 817, 821 (1977)).  "[T]o establish a constitutional violation based on a denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in actual injury to the plaintiff."  *Collins v. Goord*, 581 F. Supp. 2d 563, 573 (S.D.N.Y. 2008) (citing *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)).  "To show actual injury, the plaintiff must demonstrate that the defendant's conduct frustrated the plaintiff's efforts to pursue a nonfrivolous claim." *Id.* (citing *Lewis v. Casey*, 518 U.S. 343, 353 (1996)).

Notably, the First Amendment's protection "does not include a constitutionally guaranteed right to a law library, to legal assistance, or to some other specified aid."  *Gill v. Pact Org.*, No. 95 CIV. 4510 (LAP), 1997 WL 539948, at *4 (S.D.N.Y. Aug. 28, 1997) (citing *Lewis*, 518 U.S. at

349).  The Constitution only requires prison officials to ensure that inmates "be able to present their grievances to the court . . . [which can be accomplished by a] limited degree of legal assistance." *Lewis v. Casey*, 518 U.S. 343, 360 (1996).

Plaintiff alleges that "the defendants' goal was to violate McGriff's First Amendment right to petition the courts for judicial review."  (AC ¶ 67).  In particular, Plaintiff alleges that he was "purposely confined to exact punishment prior to any hearing, prohibit him from properly utilizing the law library, prevent him from gathering evidence to present at the hearing, and prevent him from properly laying a foundation on the record for appeal purposes."  (*Id.*)  These allegations are conclusory, and do not indicate how Plaintiff's efforts were effectively "frustrated."  Plaintiff's Amended Complaint has failed to identify any "deliberate and malicious" conduct, let alone any injury relating to his access to the courts claim.  *Cf. Corby v. Conboy*, 457 F.2d 251, 253 (2d Cir. 1972) (plaintiff stated a cause of action by his allegations that prison officials "hindered plaintiff in his ability to prepare legal papers, such as by delaying his letters to courts and law book publishers, by refusing him access to the prison typewriter and law library, and by confiscating nine of his law books, and have placed him in segregated confinement under degrading conditions for his refusal to discontinue his legal activities and told "either directly or indirectly" that the segregation would continue until his lawsuits ceased.").  Therefore, the Amended Complaint does not include a facially plausible claim for denial of access to the courts upon which relief can be granted and this claim is dismissed with prejudice.[9]  The Court thus need not address Defendants' 12(b)(1) arguments regarding this claim.

---

[9] It is well-settled that the failure to oppose an argument raised in a motion to dismiss is deemed a concession of the argument and abandonment of the claims.  *See Wilkov v. Ameriprise Fin. Servs., Inc.*, 753 F. App'x 44 (2d Cir. 2018) ("We affirm the District Court's dismissal of those claims on the ground that they were 'abandoned' by Wilkov when she failed to oppose them in her opposition to Ameriprise's motion to dismiss."); *Black Lives Matter v. Town of Clarkstown*, 354 F. Supp. 3d 313 (S.D.N.Y. 2018) ("The failure to oppose a motion to dismiss a claim is deemed abandonment of the claim.") (quoting *Johnson v. City of New York*, 15-CV-8195, 2017 WL 2312924, at *18 (S.D.N.Y.

## IV.    Fourteenth Amendment Equal Protection

Plaintiff also fails to plausibly allege that Defendants violated his Equal Protection rights. The Equal Protection Clause of the Fourteenth Amendment declares that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985).  A plaintiff must also demonstrate that the conduct "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not 'reasonably related to [any] legitimate penological interests.'"  *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)).

Plaintiff's Amended Complaint appears to pursue a "class of one" equal protection claim. The class-of-one theory permits a plaintiff, not in a protected class, to state a cognizable claim if she establishes that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Analytical Diag. Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)); *Holmes v. Haugen*, 356 F. App'x 507, 509 (2d Cir. 2009) (summ. order).  The Second Circuit has clarified that, to prevail on a class-of-one Equal Protection claim, a plaintiff must establish that he and a comparator are "*prima facie* identical" by showing that

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances

---

May 26, 2017)); *see also Robinson v. Fischer*, No. 09 CIV. 8882 LAKAJP, 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010) (collecting cases).

Defendants correctly note that Plaintiff has abandoned his denial of access to the courts claim by failing to address any arguments on this issue in his Opposition brief.  Plaintiff's Opposition contains no First Amendment analysis or refutation, and therefore Plaintiff has conceded and abandoned this claim.

and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

*Hu v. City of New York*, 927 F.3d 81, 92 (2d Cir. 2019) (quoting *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005)).

Facing this high bar, Plaintiff fails to make such allegations. Plaintiff claims he was "treated differently not just from other prisoners, but from his own alleged co-defendant that received the same charges from the same Inv. Keyser concerning the same incident." (AC ¶ 74). Even taking as true that Inmate Aramas received the same charges concerning the same incident, it is not clear that Inmate Aramas was a "similarly situated," "*prima facie* identical" comparator to Plaintiff. For instance, Plaintiff's own complaint describes Inmate Aramas as the "alleged ringleader" (*Id.* ¶ 72), which suggests that Inmate Aramas's involvement in the alleged conspiracy differed from Plaintiff's role. Irrespective of Plaintiff's attempts to point to differential treatment (*see, e.g., id.* ¶¶ 68–71, 74, 80), the claim must be dismissed with prejudice because Plaintiff fails to identify a sufficiently "similarly situated" comparator. *See United States v. Faison*, 670 F. App'x 721, 722 (2d Cir. 2016) (summ. order) (affirming dismissal of equal protection claim where plaintiff "ha[d] not demonstrated that any potential comparators are 'prima facie identical' to him.").[10]

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. Plaintiff's due process claim with regard to the keeplock confinement is dismissed without prejudice. Plaintiff's due process claims are dismissed as to Defendants

---

[10] In addition, Defendants correctly note that Plaintiff has abandoned his equal protection claim by failing to address any arguments on this issue in his Opposition brief. Plaintiff's Opposition contains no equal protection analysis or refutation, and therefore Plaintiff has conceded and abandoned this claim. *See supra* note 9.

Venettozzi and Sup. Keyser. Plaintiff's due process claims as to the SHU confinement, against Defendants HO Polizzi and Inv. Keyser, remain.

Plaintiff's Eighth Amendment claim is dismissed without prejudice as to Defendants Venettozzi, HO Polizzi, and Inv. Keyser. Plaintiff's Eighth Amendment claim against Sup. Keyser remains.

Plaintiff's First Amendment claim and Fourteenth Amendment equal protection claim are dismissed as to all defendants.

Plaintiff may file a Second Amended Complaint within 30 days of the date of this Opinion, on or before December 16, 2019, should he choose to reassert his due process claim with regard to the keeplock confinement and/or his Eighth Amendment claims as to Defendants Venettozzi, HO Polizzi, and Inv. Keyser, which were dismissed without prejudice. Accordingly, the Clerk of the Court is respectfully directed to terminate Defendant Venettozzi and Defendants' Motion to Dismiss at ECF No. 54. If Plaintiff does not file a Second Amended Complaint by December 16, 2019, remaining Defendants are directed to file an answer to the First Amended Complaint on or before January 10, 2020. The parties are directed to confer, complete, and submit to the Court the attached case management plan on or before January 31, 2020. The Clerk of the Court is further directed to mail a copy of this Opinion to Plaintiff at his last address listed on ECF and file proof of service on the docket.

This constitutes the Court's Opinion and Order.


Dated:   November 13, 2019                          SO ORDERED:
         White Plains, New York

                                            _____
                                            NELSON S. ROMÁN
                                            United States District Judge

29